FILED

2016 Apr-11  AM 09:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **LATONVIA SHELTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  6:12-cv-2204-MHH** |
| | ) | |
| **JOHN JACKSON, individually and** | ) | |
| **in his official capacity as Chief of** | ) | |
| **Police for the City of Dora, Alabama,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Latonvia Shelton sued defendant John Jackson individually and in his official capacity as Chief of Police for the City of Dora, Alabama.  Ms. Shelton alleges that Chief Jackson violated her rights under the Fourth Amendment and Alabama state law.  (Doc. 1; Doc. 30).  Chief Jackson asks the Court to enter judgment in his favor on Ms. Shelton's claims because, he argues, Ms. Shelton cannot prove her claims, and he is immune from Ms. Shelton's claims.  (Doc. 102; Doc. 103).

For the reasons discussed below, the Court finds that there are material questions of fact regarding Ms. Shelton's excessive force and assault and battery claims, and Chief Jackson is not entitled to immunity as to those claims.  Therefore, the Court has denied Chief Jackson's motion for summary judgment on

Ms. Shelton's Fourth Amendment excessive force claim and her assault and battery claim under Alabama state law. (Doc. 111). Chief Jackson is entitled to summary judgment on Ms. Shelton's Fourth Amendment wrongful search and seizure claim and her false arrest, negligence, and wantonness claims under Alabama state law. The Court has entered judgment for Chief Jackson on those claims. (Doc. 111).

## I.     Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.   Relevant Facts and Procedural Background[1]

On June 21, 2010, while serving as the Chief of Police for the Dora Police Department, defendant John Jackson arrested Ms. Shelton at her home.  (Doc. 103-1, p. 2).  Ms. Shelton's claims against Chief Jackson arise out of her arrest.  (*See* Doc. 1; Doc. 30).

Approximately one week before her arrest, Ms. Shelton had surgery on her left knee.  (Doc. 103-2, p. 39).  Ms. Shelton took Lortab, a prescription pain medication, and she "wasn't feeling like [her]self" after her surgery.  (Doc. 103-2, p. 40).  When asked if she felt mentally stable in the days following her surgery, Ms. Shelton replied that she felt "like something was wrong."  She stated:  "My body—my body was just different.  And I had so many things going on I just—I just wasn't myself."  (Doc. 103-2, p. 44).  Ms. Shelton admits that there are gaps of time that she cannot remember between June 13, 2010 and June 21, 2010.  (Doc. 103-2, pp. 45–46).

---

[1] In her brief in opposition to the defendant's motion for summary judgment, Ms. Shelton did not provide citations to the record in her statement of facts.  She cited to her deposition and to affidavits sporadically in the argument section of her brief.  (Doc. 105).  Rule 56(c)(1) of the Federal Rules of Civil Procedure states that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ," and Rule 56(c)(3) states that "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Accordingly, in this opinion, the Court draws the statement of the relevant facts from Ms. Shelton's deposition testimony, the affidavits that the parties have provided, and the defendant's statement of facts.  The Court disregards Ms. Shelton's statement of facts to the extent that it is not supported by the Rule 56 record.  The Court views the summary judgment evidence in the light most favorable to Ms. Shelton.

3

In the days leading up to her arrest, Ms. Shelton placed several 911 calls to the Dora Police Department.  Ms. Shelton called 911 on the afternoon of June 18, 2010.   During the call, she asked the dispatcher to give Chief Jackson the following message:  "I didn't like the way he disrespected me yesterday, so he don't work for Dora Police Department no more, tell him he works for me."  (Doc. 103-2, pp. 42–43).  Ms. Shelton does not remember placing the call, and she does not know why she said Chief Jackson worked for her.  (Doc. 103-2, pp. 43–44).

Ms. Shelton also called 911 on June 21, 2010 at approximately 3:00 a.m. to report that her car had been stolen from her driveway.  (Doc. 103-2, pp. 51–53). Ms. Shelton told the dispatcher she believed her daughter or her ex-husband may have taken the car because Ms. Shelton "was getting ready to go to Sandestin and they didn't want [her] to go out of town because [she] just had a knee replacement . . . ."  (Doc. 103-2, p. 53).  Ms. Shelton asked the dispatcher to "send somebody that's going to be quick about" getting to her house.  (Doc. 103-2, p. 52).  Ms. Shelton does not remember making the call or reporting her car stolen.  (Doc. 103-2, p. 54).

Later in the morning on June 21, at approximately 9:45 a.m., Ms. Shelton called 911 again to ask why the police had not yet come to her house after she reported her car stolen.  (Doc. 103-2, pp. 55–56).  Ms. Shelton told the dispatcher, "I just called and asked [Chief Jackson] to come to my house.  He said he was on

4

his way.  I've been out here 30 minutes.  Could you call him?"  (Doc. 103-2, p.

56).  Ms. Shelton does not remember placing this call.  (Doc. 103-2, p. 57).

Approximately one hour after that call, Ms. Shelton's cousin, Tonya

Williams, called the Dora Police Department to report that Ms. Shelton had

threatened to kill herself.  (Doc. 103-2, p. 57; Doc. 103-3, p. 2).  The transcript of

Ms. Williams's call is as follows:

> Ms. Williams:  Is [Chief Jackson] in?
>
> Dispatcher:  He's out on the road on patrol, can I take a message?
>
> . . .
>
> Ms. Williams: [Ms. Shelton, my cousin,] just called and said she was going to kill herself if he didn't get to her house.  Can you get [Chief Jackson] just to meet me up there?  . . .  I'm on my way up there now.
>
> Dispatcher:  What's your name?
>
> Ms. Williams:  Tonya Williams.
>
> Dispatcher:  Tonya.  Okay.  I'll tell him.

(Doc. 103-2, p. 57).  Ms. Shelton disputes that she told Ms. Williams she was

going to kill herself, but she does not dispute that Ms. Williams placed the call

reporting her alleged suicide threat to the police department.  (*See* Doc. 103-2, p.

58; Doc. 105, p. 6).

After Ms. Williams's call, the dispatcher reported Ms. Shelton's suicide

threat to Chief Jackson.  (Doc. 103-1, p. 2).  Because he was concerned for Ms.

Shelton's life, Chief Jackson drove to Ms. Shelton's house, and he met Ms.

Williams there.  (Doc. 103-1, p. 2).   When Ms. Williams and Chief Jackson arrived, Ms. Shelton was on the phone.  (Doc. 103-2, p. 59; Doc. 109-1, ¶¶ 2–3).[2] Ms. Williams walked in Ms. Shelton's house, and Chief Jackson followed her.[3] (Doc. 103-2, p. 60).  Ms. Shelton put the phone down and asked Ms. Williams why she was in her house.   (Doc. 103-2, p. 60).   The situation then deteriorated. According to Ms. Shelton, Ms. Williams then:

> said she was worried about me and I told her that I asked her not to come here.  And I got angry—I got angry with her and I grabbed her. I grabbed her.  [. . .]  And I told her that I wanted them out of my house.  I told them they had to leave my house.  And I grabbed [Ms. Williams] and I was pulling her out of my house and I—I was using force, pulling her out of my house.  [. . .]  And I was shaking her and pulling her out of my house and [Chief Jackson] snatched me off [Ms. Williams] and he started to take me out [the] door . . . .  [. . .]  He started to pull me down [the] steps [] and [Ms. Williams] told him that—not to hurt me, I had just had surgery, not to hurt me.  And he was pulling me and I was telling him that he was hurting me.  And he was hurting me.  So [Ms. Williams] come out, he come out, I come out, [sic] and he told me that . . . I was going to jail. [. . .]  And . . . when [Chief Jackson] put the handcuffs on me I was facing [Ms. Williams] and [she] was still standing in the garage.  And I told [Ms.

---

[2] Ms. Shelton submitted a signed affidavit on June 12, 2015 after this Court granted her motion for leave to supplement her brief in opposition to the motion for summary judgment.  (*See* Docs. 107, 108 & 109).  Chief Jackson argues that the Court should not consider Ms. Shelton's affidavit, *see* Doc. 110, pp. 8–9, but he did not move to strike the affidavit.  The Court has considered Ms. Shelton's affidavit to the extent it is consistent with her deposition testimony. The Court has disregarded the portions of Ms. Shelton's affidavit that contradict her deposition testimony.

[3] Chief Jackson denies that he entered Ms. Shelton's house with Ms. Williams.  He attested: "Williams entered Shelton's house, while I remained at the door.  Williams attempted to speak to Shelton in the kitchen area, but Shelton rapidly charged toward Williams, and grabbed her. Shelton was also acting very upset, and screaming at Williams.  When I saw Shelton physically engage Williams, I was immediately concerned for Williams's safety, so I entered the kitchen, and separated the two women."  (Doc. 103-1, pp. 2–3).

Williams] that she was a dirty MF for bringing the police to my house and she had no right to bring the police to my house and she had no right to be at my house at all because I didn't call [her]. [. . .]  And I told her that I hated her . . . [a]nd I was never going to speak to her again. [. . .]  I spit on her and I told her she was a dirty—a dirty motherfucker. . . .  I spit on her in the face.

(Doc. 103-2, pp. 61–67).

Chief Jackson stated that he was concerned for Ms. Williams's safety and decided to place Ms. Shelton under arrest "[b]ased on [her] activities and apparent mental state . . . ." (Doc. 103-1, p. 3).  Chief Jackson put Ms. Shelton in handcuffs "out of concern for the safety of [Ms.] Williams and [him]self." (Doc. 103-1, p. 3). "When [he] saw [Ms.] Shelton spit on [Ms.] Williams, after seeing [her] physically engage [Ms.] Williams previously, it confirmed [his] belief that [Ms.] Shelton was a danger to herself and others, and needed to be taken into custody." (Doc. 103-1, p. 3).

According to Chief Jackson, he "escorted [Ms.] Shelton into [his] patrol car, taking care not to use too much force, or have her head hit any part of the patrol car." (Doc. 103-1, p. 3).  Ms. Shelton disputes Chief Jackson's statement.  She testified that "before putting her in the car, [Chief] Jackson 'banged' her head on the trunk or rear of his police vehicle up to four or five times." (Doc. 103, p. 8 n.1 (citing Ms. Shelton's deposition testimony, pp. 126–28); Doc. 109-1, ¶ 9).

Chief Jackson did not speak to Ms. Shelton during the drive to the police station.  (Doc. 103-1, p. 3; Doc. 103-2, p. 68).  When they arrived at the Dora

police station, Chief Jackson brought Ms. Shelton into the dispatch area in the station.  (Doc. 103-1, p. 3).   Ms. Shelton testified that Chief Jackson pulled her across the parking lot into the police station.  (*See* Doc. 103-2, p. 70; Doc. 109-1, ¶ 10).

After they entered the station, Chief Jackson stood behind Ms. Shelton and began to remove the handcuffs.  (Doc. 103-1, p. 3; Doc. 103-2, p. 75).   After he removed one cuff, Ms. Shelton turned and hit Chief Jackson in the head with both her hand and the attached handcuff.  (Doc. 103-1, pp. 3–4; Doc. 103-3, p. 2; *see also* Doc. 109-1, ¶ 11).   Chief Jackson stated he "was almost knocked over by [Ms.] Shelton's attack, [and he] pushed Shelton away, onto the dispatch desk." (Doc. 103-1, p. 4).  He contends that he "did not punch or attack [Ms.] Shelton, but merely attempted to hold her down so that [he] could put handcuffs back on her." (Doc. 103-1, p. 4).

Ms. Shelton disputes Chief Jackson's account of the incident in the booking room.  She testified:

> A:  [Chief Jackson] took one of the handcuffs off of me and I hit him. I turned around and hit him in the face.  [. . .]  I remember hitting him . . . on the jaw. . . .
>
> Q:  . . . You hit him pretty hard, right?
>
> A:  I can't remember.  But I hit him.
>
> Q:  Okay.  Did you knock him—knock his—

A:   No.  I didn't hit him like that because he didn't move.  He turned around—he turned around at me and he picked me up and he threw me on this desk right here and he kept beating me and beating me and beating me, beating me, beating me, beating me.  And I tried to—my legs was [sic] hanging down off of the desk and I was trying to sit up and he kept hitting me, hitting me . . . .

(Doc. 103-2, pp. 75–76;[4] *see also* Doc. 109-1, ¶ 12).  Ms. Shelton testified that she takes responsibility for hitting Chief Jackson and admits it is wrong to hit a police officer, though she also stated Chief Jackson was "hitting [her] before [she] even hit him."  (Doc. 103-2, p. 94).

Dessie Robinson, the jailer/dispatcher for the Dora Police Department, witnessed the incident and stated that after Ms. Shelton hit Chief Jackson, he "pushed [Ms.] Shelton away from his face and down on the dispatch desk where she continued to scream, kick, and repeatedly tried to strike him."  (Doc. 103-3, p. 2).  Chief Jackson stated "[b]ecause of [Ms.] Shelton's violent displays at her home, and now within the [p]olice [s]tation, [he] feared for the safety of [Ms.] Robinson and [him]self, and made the decision to attempt to subdue [Ms.] Shelton with OC spray, a.k.a. 'pepper spray.'"  (Doc. 103-1, p. 4).

After Chief Jackson sprayed Ms. Shelton with the OC spray, she grabbed Ms. Robinson and "buried her face into [Ms. Robinson's] chest."  (Doc. 103-3, p. 2).  Ms. Shelton "remember[s] crying and . . . standing there and [her] body was

---

[4] The balance of Ms. Shelton's testimony regarding this incident is not part of the Rule 56 record.

burning." (Doc. 103-2, p. 78). Chief Jackson left the booking room after spraying Ms. Shelton with the OC spray "to recover his own breath." (Doc. 103-3, p. 2).[5]

Ms. Robinson then took Ms. Shelton to a jail cell, and Ms. Robinson "advised [Ms. Shelton] to get into the shower and brought her a towel and a cup so she could rinse off the spray." (Doc. 103-3, p. 2). Ms. Shelton remembers "throwing water on [her] body," and testified she "washed [the spray] off from the toilet and the sink . . . ." (Doc. 103-2, pp. 78–79).

After Chief Jackson sprayed Ms. Shelton with the OC spray and Ms. Robinson placed Ms. Shelton in a jail cell, Chief Jackson and Ms. Shelton had no further physical or verbal interactions. (Doc. 103-1, p. 4; Doc. 103-2, p. 81). Ms. Shelton was charged with domestic violence for the incident with Ms. Williams

---

[5] Donald Eric Dollar, an inmate in the Dora jail on June 21, 2010, attested that he witnessed the incident in the booking area between Chief Jackson and Ms. Shelton. (Doc. 105-1, pp. 6–7). According to Mr. Dollar, he "could see [Ms. Shelton] being strong armed by [Chief] Jackson as he was pushing her toward the woman['s] cell. The chief had her arms behind her back. [. . .] Ms. Shelton was screaming very loud[ly] and unintelligently [sic] while the Chief was pushing her toward the [] cell. [. . .] Suddenly, [he] saw Chief Jackson grab Ms. Shelton by the hair in the back of her head and slammed her into the women['s] cell. She screamed louder. Then the Chief and officer Tim Hyde commenced 'macing' Ms. Shelton for about three-four minutes. She was still screaming out in pain." (Doc. 105-1, p. 7). Mr. Dollar's statement conflicts not only with Chief's Jackson's statement regarding the incident, but also with Ms. Shelton's deposition testimony. Because Mr. Dollar's statement conflicts with Ms. Shelton's own testimony, the Court will not consider the statement on summary judgment. *See Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc) ("When the nonmovant has testified to events, we do not . . . pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant. Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version.") (emphasis and internal footnote omitted). Even if the Court considered Mr. Dollar's statement, it would have no impact on the Court's decision.

and harassment for her attack on Chief Jackson, and she was held in the Dora jail with a $500 bond.[6]  (Doc. 103-1, p. 4).

According to Ms. Robinson, once in the jail cell, Ms. Shelton "continued her erratic behavior." (Doc. 103-3, p. 2).  Ms. Shelton said:

> she was a millionaire and now owned the City of Dora, had fired Chief Jackson so that he now worked for her as security, had fired Sheriff John Mark Tirey, that she had spoken to God and he had told her to become a pastor and she could change her name to Rev. Milkshake, that her family members had assaulted her and stolen her 14 Mercedes and refused to return them, that she made her millions suing people and that her family was jealous of her because of that.

(Doc. 103-3, p. 2).   Chief Jackson feared for Ms. Shelton's mental state and "ordered that [she] be taken to the Walker Baptist Medical Center Behavioral Unit for a psychiatric evaluation." (Doc. 103-1, p. 4).

Ms. Shelton does not remember anything between when she went to the jail cell until she was in the Walker Baptist Medical Center behavioral medicine unit, and she does not know how she got to the medical center from the jail.  (*See* Doc. 103-2, pp. 81, 83).  Ms. Shelton did not know she was in the behavioral medicine unit until the second or third day she was there.  (Doc. 103-2, p. 82).  Ms. Shelton simply remembers that she "ended up at the [medical] center on the 23rd." (Doc. 103-2, p. 83).  Ms. Shelton spent a week at the behavioral medicine unit and was released from the medical center on June 30, 2010.  (Doc. 103-2, p. 89).

---

[6] Ms. Shelton was found guilty of these charges in the Municipal Court of Dora, but the charges were dismissed when she appealed to the Circuit Court of Walker County.  (Doc. 103-2, p. 93).

After she was released from the medical center, Ms. Shelton went home, and she testified she "remember[s] being so mixed up when I came home and so confused about what was going on and what happened to me."  (Doc. 103-2, p. 90).  Ms. Shelton admits that she does not recall much of what happened in the days prior to her arrest through her release from the medical center and that she was "having some mental problems during that time period."  (Doc. 103-2, p. 90). Ms. Shelton testified "they told [her] at the hospital that [she] had a mental breakdown and [she] still don't [sic] know what that means."  (Doc. 103-2, p. 91).

Ms. Shelton filed this action on June 19, 2012.  (Doc. 1).  She initially brought claims against Chief Jackson; the mayor of Dora, Alabama; and members of the city council of Dora, and she amended her claims on August 30, 2012. (Doc. 1; Doc. 30).  This Court dismissed Ms. Shelton's claims against the mayor and city council members without prejudice on August 18, 2014; Chief Jackson is the only remaining defendant.  (Doc. 67).  Ms. Shelton asserts claims against Chief Jackson for alleged violations of the Fourth Amendment and Alabama state law, and she seeks damages pursuant to 42 U.S.C. § 1983 and Alabama state law. (Doc. 30).  Chief Jackson moved for summary judgment on all of Ms. Shelton's claims against him.  (Doc. 102).

## III.   Analysis

### A. <u>Ms. Shelton's Fourth Amendment Claims</u>

Ms. Shelton asserts that Chief Jackson violated her constitutional rights under the Fourth Amendment by wrongfully entering her home and arresting her without a warrant or probable cause and by using excessive force when he arrested her.  (Doc. 30, pp. 5–6).  Chief Jackson argues that he is entitled to summary judgment on these claims because he had probable cause to enter Ms. Shelton's home and arrest her, and he used only de minimus force to make the arrest, so that he is entitled to qualified immunity with respect to Ms. Shelton's Fourth Amendment claims.  (Doc. 103, pp. 13–35).[7]

"'Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 733 (11th Cir. 2010) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir 2002)) (internal quotation marks omitted).   Qualified immunity allows government officials,

---

[7] Ms. Shelton argues that Chief Jackson cannot raise qualified immunity in his summary judgment motion because he previously raised the defense in his motion to dismiss, and this Court denied the motion.  (Doc. 105, pp. 5, 10–11).  Ms. Shelton's argument fails procedurally. When the Court examined Chief Jackson's motion to dismiss, the Court could consider only the allegations in Ms. Shelton's amended complaint, and the Court had to view those allegations in the light most favorable to Ms. Shelton.  *See* Fed. R. Civ. P. 12(b).  Now, discovery is complete, and the Court must consider the facts developed during discovery when ruling on Chief Jackson's motion for summary judgment.  *See* Fed. R. Civ. P. 56.  Accordingly, the Court's prior ruling on Chief Jackson's motion to dismiss does not preclude him from raising qualified immunity in his motion for summary judgment.

including police officers, "'to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).

To receive qualified immunity, a police officer must establish "that he was acting within his discretionary authority . . . ." *Lee*, 284 F.3d at 1194 (citing *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). A government official acts within the scope of his discretionary authority when his actions "(1) [are] undertaken pursuant to the performance of his duties and (2) [are] within the scope of his authority." *Roberts v. Spielman*, 643 F.3d 899, 903 (11th Cir. 2011) (quoting *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)) (internal quotation marks omitted).

If the officer demonstrates that he acted within the scope of his discretionary authority, then to avoid the immunity defense, the plaintiff must demonstrate that the officer violated a clearly established constitutional right. *Lee*, 284 F.3d at 1194. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (internal citation and quotation marks omitted). "The inquiry into whether a right is clearly established 'must be

14

undertaken in light of the specific context of the case, not as a broad general proposition.'" *Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012) (quoting *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011)). The Eleventh Circuit has "'said many times that if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.'" *Id.* (quoting *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000)).

The Court examines Chief Jackson's immunity defense first with respect to Ms. Shelton's Fourth Amendment warrantless entry and arrest claim and then with respect to her Fourth Amendment excessive force claim.

1. Fourth Amendment Warrantless Entry and Arrest

"Under the Fourth Amendment, an individual has a right to be free from 'unreasonable searches and seizures[,]' and an arrest is a seizure of the person." *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (quoting *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007)). Generally speaking, a law enforcement officer may not enter a person's house or arrest a person without a warrant. *Payton v. New York*, 445 U.S. 573, 586 (1980) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.") (internal quotation marks omitted). "A warrantless and nonconsensual entry into a person's home, and any resulting search or seizure, violates the Fourth Amendment unless it is supported by both

15

probable cause and exigent circumstances." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251 (11th Cir. 2013). Ms. Shelton argues that Chief Jackson violated her Fourth Amendment rights by entering her home and arresting her without probable cause or a warrant. The Rule 56 record demonstrates that Chief Jackson is entitled to qualified immunity as to this Fourth Amendment claim because exigent circumstances enabled him to enter Ms. Shelton's house, and he had probable cause to arrest her.

Exigent circumstances exist "'when there is compelling need for official action and no time to secure a warrant.'" *U.S. v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002) (quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). "The Supreme Court has long recognized that emergencies sometimes obviate the need to obtain a search warrant prior to entering a private residence." *Id.* at 1335; *see also United States v. Burgos*, 720 F.2d 1520, 1525–26 (11th Cir. 1983). Such an emergency may exist when a police officer reasonably believes a person's life is in danger. *Holloway*, 290 F.3d at 1337 ("Although the Fourth Amendment protects the sanctity of the home, its proscription against warrantless searches must give way to the sanctity of human life."). Indeed, "'the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.'" *Id.* at 1336 (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)).

16

In this case, Chief Jackson went to Ms. Shelton's house in response to an emergency call concerning a reported suicide threat, and he entered the house because he believed that Ms. Shelton was in danger.  As a police officer, Chief Jackson was authorized to respond to the emergency call, even if the report regarding Ms. Shelton's suicide threat proved to be inaccurate.  *See Roberts*, 643 F.3d at 904 (holding a police officer acted within the scope of his discretionary authority when he responded to a call about a possible suicide threat at the plaintiff's home and remained on the property for a brief period of time after the plaintiff asked him to leave); *Holloway*, 290 F.3d at 1340 ("The fact that . . . the information ultimately proves to be false or inaccurate[] does not render the police action any less lawful.").  Thus, Chief Jackson acted within his discretionary authority when he entered Ms. Shelton's house.

Once inside the house, Chief Jackson had probable cause to arrest Ms. Shelton.  "[T]he existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest."  *Brown*, 608 F.3d at 734.  "In a long line of cases, [the Supreme Court has] said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt.  The arrest is constitutionally reasonable."  *Virginia v. Moore*, 553 U.S. 164, 171 (2008).  Probable cause exists when the facts known to the officer "are sufficient to cause a

person of reasonable caution to believe that a criminal offense has been or is being committed." *Brown*, 608 F.3d at 734 (citing *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997)).

Under Alabama law, "[a] person commits the crime of harassment if, with intent to harass, annoy, or alarm another person, he or she [] [s]trikes, shoves, kicks, or otherwise touches a person or subjects him or her to physical contact." Ala. Code 1975 § 13A-11-8. Chief Jackson explained that he arrested Ms. Shelton after he saw her physically assault Ms. Williams because he was concerned for Ms. Williams's safety.

Ms. Shelton acknowledges her use of force against Ms. Williams but argues that the force was lawful, and as a result, Chief Jackson did not have probable cause to arrest her. (Doc. 105, pp. 22–23). Under Ala. Code 1975 § 13A-3-25(a), "[a] person in lawful possession or control of premises . . . may use physical force upon another person when and to the extent that he reasonably believes it necessary to prevent or terminate what he reasonably believes to be the commission . . . of a criminal trespass . . . ." To commit a criminal trespass, an individual must "knowingly enter[] or remain[] unlawfully in or upon premises." Ala. Code 1975 § 13A-7-4(a).

Ms. Shelton's entitlement to the protection of Ala. Code 1975 § 13A-3-25(a) is doubtful, but the Court need not resolve the issue. "To receive qualified

18

immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." *Brown*, 608 F.3d at 734.  Even if Ms. Williams committed a criminal trespass and Ms. Shelton reasonably believed that force was necessary to terminate Ms. Williams's trespass, Chief Jackson remains immune to suit for Ms. Shelton's arrest.

The record does not contain any evidence that Chief Jackson was aware that Ms. Williams had been asked to stay away from Ms. Shelton's house.  (*See* Doc. 105, p. 6).  Accordingly, Chief Jackson had no reason to believe that Ms. Williams was committing a criminal trespass or that Ms. Shelton was justified in forcibly removing Ms. Williams from the premises.  The record does demonstrate that Chief Jackson witnessed Ms. Shelton grab and pull Ms. Williams with apparently little provocation.  (Doc. 103-1, pp. 2–3; Doc. 103-2, pp. 61–62).  Because "reasonable officers in the same circumstances and possessing the same knowledge as [Chief Jackson] could have believed that probable cause existed to arrest [Ms. Shelton]," Chief Jackson had arguable probable cause to arrest Ms. Shelton. *Brown*, 608 F.3d at 734 (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)).

Ms. Shelton has offered no evidence that would allow her to establish that Chief Jackson violated a known constitutional right either when he entered her house or when he arrested her.  With respect to the warrantless entry, there is no

evidence that suggests that Ms. Shelton's cousin, the individual who called the police to report Ms. Shelton's purported suicide threat, was not a credible source. Ms. Shelton has provided no evidence to dispute Chief Jackson's assertion that he reasonably believed she was in danger.  With respect to the arrest, Ms. Shelton acknowledges that when Chief Jackson intervened and arrested her, she was "using force" against Ms. Williams, shaking her and "pulling her out of [the] house." (Doc. 103-2, pp. 61–62).     Therefore, Chief Jackson had—at least—arguable probable cause to believe Ms. Shelton committed a criminal offense in his presence, and he did not violate Ms. Shelton's Fourth Amendment rights by arresting her, even though he did not have an arrest warrant.

Ms. Shelton relies primarily on *Sheth v. Webster*, 145 F.3d 1231 (11th Cir. 1998), to support her argument Chief Jackson is not entitled to qualified immunity. (*See* Doc. 105, pp. 11–14).  The facts of *Sheth v. Webster* are easily distinguished from the present case.  In *Sheth*, a police officer responded to a dispute at a motel. An occupant of the motel was demanding a refund from the plaintiff, the owner of the motel.  145 F.3d at 1234.  The plaintiff refused to refund the money unless the occupant removed his belongings from the motel room.  When the police officer suggested the plaintiff was not familiar with U.S. law because she was Indian, the plaintiff said to him, "[p]olice officers don't know all the laws, [] but I know some laws and my rights."  *Id.*  In response, the police officer pushed and struck the

20

plaintiff, handcuffed her, and arrested her.  *Id.* at 1234–35.  The Eleventh Circuit held that the officer was not entitled to qualified immunity because no reasonable police officer "could have believed that probable cause existed to arrest [the] plaintiff."  *Id.* at 1238.

Unlike the officer in *Sheth*, Chief Jackson witnessed Ms. Shelton physically grab and shake Ms. Williams.  Ms. Shelton did not simply tell Ms. Williams and Chief Jackson to leave her premises; she acknowledges that she used force to accomplish her objectives.  (*See* Doc. 103-2, pp. 61–62; Doc. 105, p. 14).  Therefore, *Sheth* does not advance Ms. Shelton's attempt to avoid Chief Jackson's qualified immunity defense.

Consequently, Chief Jackson is entitled to summary judgment on Ms. Shelton's claim that he violated her Fourth Amendment rights by wrongfully entering her home and arresting her without a warrant.

2.  Fourth Amendment Excessive Force

Even though Ms. Shelton failed to present a question of fact with respect to her unlawful entry and arrest theory, she still may proceed with a Fourth Amendment claim if she can establish that Chief Jackson violated her right to be free from excessive force during the arrest.  *See Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).   "The Supreme Court has instructed that all claims that law enforcement officers have used excessive force—deadly or not—in the

course of an arrest . . . should be analyzed under the Fourth Amendment and its reasonableness standard." *Jackson v. Sauls*, 206 F.3d 1156, 1169 (11th Cir. 2000) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (emphasis and internal quotation marks omitted).

". . . Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect [the arrest]." *Graham*, 490 U.S. at 396. Accordingly, "the application of de minimus force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000).  However, "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force."  *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008).

A court must evaluate allegations of excessive force objectively, without regard to an officer's subjective intent.  *Jackson*, 206 F.3d at 1170.  "A law enforcement officer is entitled to qualified immunity if 'an objectively reasonable officer in the same situation could have believed that the force used was not excessive.'"  *Brown*, 608 F.3d at 733 (quoting *Vinyard*, 311 F.3d at 1346).  An officer is not entitled to qualified immunity if his conduct was "so far beyond the hazy border between excessive and acceptable force that the officer had to know he was violating the Constitution."  *Hoyt*, 672 F.3d at 978 (quoting *Smith v. Mattox*,

127 F.3d 1416, 1419 (11th Cir. 1997)) (internal quotation marks and alteration omitted).

In *Graham v. Connor*, the Supreme Court identified several factors for courts to consider when determining whether an officer's use of force was excessive. These factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. "*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Lee*, 284 F.3d at 1198.

Relying on *Graham*, the Eleventh Circuit held in *Lee v. Ferraro* that an officer used excessive force in violation of the Fourth Amendment when he "slammed" the plaintiff's head against the trunk of the officer's vehicle after he arrested her for honking her horn in traffic and secured her in handcuffs. 284 F.3d at 1198. Like the plaintiff in *Lee*, Ms. Shelton testified that Chief Jackson banged her head on the trunk of his car four or five times after he placed her in handcuffs. (Doc. 103, p. 8 n.1; *see also* Doc. 103, p. 31). Although the undisputed facts indicate that at the time of Ms. Shelton's arrest she was screaming and spitting at Ms. Williams, the Rule 56 record does not show Ms. Shelton posed an immediate

23

danger to Chief Jackson or Ms. Williams after Chief Jackson placed her in handcuffs, and there is no evidence that she was actively resisting or trying to evade arrest.[8]  Accordingly, there is a question of fact regarding Chief Jackson's alleged use of force at this juncture.[9]

Chief Jackson's argument that he used only de minimus force is unavailing. Indeed, *Nolin v. Isbell*, 207 F.3d 1253 (11th Cir. 2000), the primary case that Chief Jackson relies upon, undermines his argument.  In *Nolin*, the defendant officer witnessed what he believed to be a fight between a criminal suspect and another man.  The officer saw the suspect "drag [the man] to the ground."  207 F.3d at 1254–55.  Based on those observations, the officer "grabbed [the suspect] from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him."  *Id.* at 1255.  Based on those facts, the Eleventh Circuit held the officer's use of force to make the

---

[8] Although Ms. Shelton did strike Chief Jackson when he removed one of her handcuffs, that does not necessarily show she posed an immediate threat to him when she was secured in the handcuffs.

[9] The *Lee* decision pre-dated Ms. Shelton's arrest and clearly established the constitutional right of an arrestee to be free from excessive force after she is handcuffed.  "Even though [the officer] undoubtedly possessed the lawful power to effect a custodial arrest and secure [the suspect] with handcuffs, a reasonable officer could not possibly have believed that he then had the lawful authority to take her to the back of her car and slam her head against the trunk *after* she was arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed.  Once an arrestee has been fully secured, such force is wholly unnecessary to any legitimate law enforcement purpose.  [. . .]  Slamming the head of a handcuffed, subdued arrestee against the trunk of a car is objectively unreasonable and clearly unlawful."  *Lee*, 284 F.3d at 1199–200 (emphasis in original).

arrest was not excessive, and the officer was entitled to qualified immunity. *Id.* at 1258.

The present case is easily distinguished from *Nolin* because the suspect in that case had not been placed in handcuffs when the defendant officer used force to arrest the suspect. *Id.* at 1254–55. The evidence here indicates that Ms. Shelton was in handcuffs when Chief Jackson allegedly banged her head on the trunk of his car. This distinction is material. Indeed, in a decision the Eleventh Circuit quoted in *Nolin*, the Circuit "concluded that 'once the plaintiff was handcuffed and taken outside, no further force was needed.'" *Id.* at 1256 (alterations omitted) (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).

Because there is no evidence that force was necessary after Chief Jackson placed Ms. Shelton in handcuffs, a jury must decide whether Chief Jackson used excessive force when he arrested Ms. Shelton.[10] As a result, the Court denies Chief Jackson's motion for summary judgment on Ms. Shelton's Fourth Amendment excessive force claim. *See Brown*, 608 F.3d at 739–40.

### B. **Ms. Shelton's State Law Claims**

---

[10] Chief Jackson contends that his alleged use of force could not be excessive because Ms. Shelton did not receive medical treatment for the injuries she purportedly sustained during her arrest. Chief Jackson cites no authority for his proposition. (Doc. 103, p. 32.) Chief Jackson's argument is not persuasive. Physical injury is not a prerequisite to a Fourth Amendment excessive force claim. In *Brown v. City of Huntsville, Ala.*, the plaintiff did not seek medical treatment for injuries resulting from the officer's use of force. The Eleventh Circuit held that the district court erred in entering judgment for the defendant based on the defendant's qualified immunity defense. 608 F.3d at 731, 740.

In addition to her Fourth Amendment claims, Ms. Shelton asserts Alabama state law claims against Chief Jackson for false arrest and false imprisonment, assault and battery, negligence, and wantonness.  (Doc. 30, pp. 7–13).  Chief Jackson argues he is entitled to summary judgment on each of those claims in part because he is entitled to discretionary function immunity under Alabama State law. (Doc. 103, pp. 35–50).

Under Alabama law, municipal police officers are immune from state tort liability "arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."  Ala. Code 1975 § 6-5-338(a); *Sheth*, 145 F.3d at 1237.  Accordingly, an officer is immune from civil liability "when the conduct made the basis of the claim against the [officer] is based upon the [officer's] . . . exercising judgment in the enforcement of the criminal laws of [Alabama], including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a) . . . ."  *Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006) (emphasis omitted).  An officer is not entitled to discretionary function immunity when he "acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."  *Id.* at 305 (internal quotation marks omitted) (quoting *Ex parte Turner*, 840 So. 2d 132, 136 (Ala. 2002), quoting in

turn *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000)); *see also Brown*, 608 F.3d at 741 (citing *Cranman*, 792 So. 2d at 405).

Analysis of discretionary function immunity under Alabama law is analogous to federal qualified immunity. An officer asserting discretionary function immunity "bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle [him] to immunity." *Ex parte Kennedy*, 992 So. 2d 1276, 1282 (Ala. 2008) (citing *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006)). If the officer satisfies his burden, the burden then shifts to the plaintiff to show that the officer is not entitled to discretionary function immunity. *Id.*

In the present case, Chief Jackson was acting as a municipal law enforcement officer when he entered Ms. Shelton's house and arrested her. (*See* Doc. 103-1). The Supreme Court of Alabama has held that "arresting a person is an exercise of judgment—a 'discretionary function'—and therefore, clothes the officer in State-agent immunity." *Swan v. City of Hueytown*, 920 So. 2d 1075, 1079 (Ala. 2005) (citing *Cranman*, 792 So. 2d at 405 and *Telfare v. City of Huntsville*, 841 So. 2d 1222, 1228 (Ala. 2002)). Additionally, Chief Jackson's decisions regarding his response to the emergency call reporting Ms. Shelton's alleged suicide threat, including his entry into her home, were an exercise of

judgment that would entitle him to discretionary function immunity as a municipal peace officer.  *See* Ala. Code § 6-5-338(a); *Swan* 920 So. 2d at 1079.

Ms. Shelton argues Chief Jackson acted vindictively or maliciously when he arrested her, so that he is not entitled to immunity as to her false arrest claim.  (*See* Doc. 105, p. 24).  Ms. Shelton's argument is based on her assertion that the arrest would not have occurred if Chief Jackson and Ms. Williams left her home when she asked them to.  (Doc. 105, p. 24).  Ms. Shelton's argument misses the mark, because the record, viewed in the light most favorable to Ms. Shelton, indicates that she did not simply tell Chief Jackson and Ms. Williams to leave her home. Rather, Ms. Shelton acknowledges that she grabbed and shook Ms. Williams before Ms. Williams and Chief Jackson could leave her home.  (Doc. 103-2, pp. 61–62).  Accordingly, Ms. Shelton has not shown Chief Jackson acted maliciously, fraudulently, or with bad faith by arresting her.  Chief Jackson is entitled to discretionary function immunity and summary judgment on Ms. Shelton's false arrest/false immunity claim.

Chief Jackson also is entitled to summary judgment on Ms. Shelton's negligence and wantonness claims.  As Chief Jackson noted, Ms. Shelton does not "assert any specific factual allegations against [him] in reference to any particular actionable conduct."  (Doc. 103, p. 45; *See also* Doc. 30, pp. 8–9).  Moreover, Ms. Shelton did not respond to Chief Jackson's arguments regarding her negligence

and wantonness claims. (*See* Doc. 105). Indeed, Ms. Shelton does not mention the negligence and wantonness claims in her brief in opposition to Chief Jackson's motion for summary judgment. (*See* Doc. 105). As a result, Ms. Shelton has abandoned these claims, and Chief Jackson is entitled to judgment in his favor as a matter of law on Ms. Shelton's negligence and wantonness claims. *See Case*, 555 F.3d at 1329 ("When a party moves for final . . . summary judgment, we have stated that it becomes incumbent upon the nonmovant to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt precluded judgment in the moving party's favor.") (internal quotation marks and alterations omitted) (quoting *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1264 (11th Cir. 2001)); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), *cert. denied*, 516 U.S. 817 (1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

The immunity analysis favors Ms. Shelton with respect to her assault and battery claim. "Under Alabama law, excessive force during an arrest constitutes assault and battery." *Ruffino v. City of Hoover*, 891 F. Supp. 2d 1247, 1279 (N.D. Ala. 2012) (citing *Franklin v. City of Huntsville*, 670 So. 2d 848, 852–53 (Ala. 1995)). Chief Jackson argues he is entitled to discretionary function immunity and summary judgment as to Ms. Shelton's assault and battery claim because police officers have a right to use some force to make an arrest, and he used only the

29

amount of force that was necessary in the situation. (Doc. 103, pp. 40–44). Ms. Shelton has offered sufficient evidence to create a question of fact as to her assault and battery claim. (Doc. 105, pp. 26–28).

Although a police officer may use reasonable force when making an arrest under Alabama law, the officer "may be held liable [] if more force is used than is necessary to effectuate the arrest." *Franklin*, 670 So. 2d at 852 (citing Ala. Code 1975 § 13A-3-27 and *Livingston v. Browder*, 285 So. 2d 923 (Ala. Civ. App. 1973)). As discussed above, disputed evidence creates a question of fact regarding Chief Jackson's use of force during Ms. Shelton's arrest. A jury must decide whether Chief Jackson acted willfully or maliciously when he allegedly banged Ms. Shelton's head against the trunk of his vehicle after he handcuffed her. *See Brown*, 608 F.3d at 742. Therefore, the Court denies Chief Jackson's motion for summary judgment as to the assault and battery claim.

## V.  Conclusion

For the reasons discussed above, the court **GRANTS IN PART** and **DENIES IN PART** Chief Jackson's motion for summary judgment. Chief Jackson is entitled to summary judgment on Ms. Shelton's wrongful search and seizure claim under the Fourth Amendment along with her Alabama state law claims for false arrest/false imprisonment, wantonness, and negligence, and these claims are **DISMISSED WITH PREJUDICE**. Chief Jackson's motion is

30

**DENIED** with respect to Ms. Shelton's excessive force claim under the Fourth Amendment and her assault and battery claim under Alabama state law.

**DONE** and **ORDERED** this April 8, 2016.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE